Docket No. 105752.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

---

ADDISON INSURANCE COMPANY, Appellee, v. DONNA FAY
*et al.*, Appellants.

*Opinion filed January 23, 2009.*

JUSTICE GARMAN delivered the judgment of the court, with opinion.

Justices Freeman, Thomas, Kilbride, Karmeier, and Burke concurred in the judgment and opinion.

Chief Justice Fitzgerald took no part in the decision.

## OPINION

Plaintiff, Addison Insurance Company, brought this declaratory action in the circuit court of Will County against the defendants, the estates of two young boys who were injured as a result of an Addison policyholder's negligent maintenance of its property. The insured's liability is not at issue in this case. Rather, this court is asked to determine whether the injuries to the boys constitute a single or multiple occurrences under the terms of Addison's insurance policy.

## BACKGROUND

At about 5 p.m. on April 30, 1997, Laura Shackelford watched her 14-year-old son, Everett Hodgins, leave her home. Hodgins left with his 15-year-old friend, Justice Carr. Shackelford believed the two boys had planned to go fishing. The two frequently fished in a nearby Commonwealth Edison cooling lake.

The two boys did not return that night. Around 10:30 p.m., Donna Fay, Justice Carr's mother, reported her son missing. The police responded that night and conducted a search. However, the police were unable to locate either boy at that time.

On May 3, 1997, the boys' bodies were found in an excavation pit on land near Justice Carr's home. The land belonged to Donald Parrish. At the time, Parrish operated a business from the property. Parrish was insured by the plaintiff, Addison Insurance Company (Addison).

The pit in which the boys were found was partially filled with water. The sand and clay around the pit was saturated, creating what an engineer testified is called a "quick condition."[1] A quick condition is one where a cushion of water prevents the soil from supporting a load of weight and can result in that load sinking and becoming trapped.

Carr and Hodgins fell prey to this condition. The boys were found at the edge of the pool of water, trapped in the wet clay and sand. Justice Carr was found facing the north bank of the pit. The lower half of his body was partially submerged in the water, and both of his legs were trapped in the sand and clay. Everett Hodgins was found facing south, toward Carr and the water. Hodgins had one leg trapped in the sand. His other leg was free. Although the two boys were facing different directions, both bodies were close in proximity and indeed were physically touching.

Both boys had been exposed to the cold water and cold weather during the time they had been missing. The doctor who performed the autopsy on each of the boys, Dr. Blum, concluded that the immediate

---

[1]All references to witness testimony refer to those witnesses' statements during discovery depositions. The parties entered these depositions into evidence by stipulation. The trial court heard no live testimony.

cause of Hodgins's death was hypothermia. Dr. Blum determined that the immediate cause of Carr's death was drowning secondary to hypothermia. Addison's forensic expert, Dr. Case, concurred with Dr. Blum's findings. Neither of the physicians could conclude with any certainty the time of death of either boy, or how closely in time the boys had perished.

Witnesses for both parties acknowledged that Hodgins's and Carr's actions between the time they left Shackelford's home and the time they were found cannot be known. However, the investigators at the scene concluded that the boys had been trapped while returning home to get out of a storm that swept in during the evening of April 30. The boys used the Parrish property as a shortcut to Carr's house, which was very close to the pit. Testimony indicated that Carr's home was approximately 100 to 150 yards from where the boys were found.

The investigators concluded that when the boys reached the pit and the water, Carr attempted to jump across the water. In doing so, Carr became trapped. The investigators also concluded that Hodgins then attempted to help his friend out of the sand and clay, but became trapped himself. However, the investigators could not conclude how much time had elapsed between Carr's and Hodgins's entrapments, or whether the two boys were even together when Carr became trapped.    The families of the two boys initially brought suit against Donald Parrish. As Parrish's insurer, Addison agreed to settle the claims for an amount equal to the policy's limits. However, the parties dispute which policy limit applies. Addison's insurance policy with Parrish provides for a "General Aggregate Limit" of $2 million. The policy also contains an "Each Occurrence" limit of $1 million. Addison brought this declaratory action to resolve whether the boys' deaths constituted one or two occurrences, and therefore whether Addison was obligated to pay $1 million or $2 million to the defendants.

The trial court found that the injuries to Carr and Hodgins were the result of two occurrences. The court acknowledged that the evidence can be viewed "in ways that tend to support both sides [*sic*] positions." However, the court found the evidence sufficient to show that the causes of death were different, and that the circumstances immediately prior to the deaths were different.

The appellate court reversed. Relying on this court's decision in *Nicor, Inc. v. Associated Electric & Gas Insurance Services Ltd.*, 223 Ill. 2d 407 (2006), and a decision by a New Jersey appellate court with similar facts, *Doria v. Insurance Co. of North America*, 210 N.J. Super. 67, 509 A.2d 220 (1986), the appellate court concluded that the boys' deaths were "so closely linked in time and space as to be considered by a reasonable person as one 'occurrence.' " 376 Ill. App. 3d 85, 91.

The substantive issue presented to this court is whether the deaths of Justice Carr and Everett Hodgins constitute a single occurrence or separate occurrences under the terms of Parrish's insurance policy. For the reasons that follow, we conclude that the deaths of Carr and Hodgins constitute two separate occurrences.

## ANALYSIS

### I. Standard of Review

The construction of a provision of an insurance policy is a question of law, subject to *de novo* review. *Nicor*, 223 Ill. 2d at 416. Both parties accept this standard with respect to determining the meaning of "occurrence" under the policy.

However, Addison contends that the findings of the trial court should also be reviewed *de novo* in determining the number of occurrences. In contrast, defendants argue that the appellate court improperly disregarded the trial court's factual findings in concluding that the boys came to the pit together and were trapped moments apart. Defendants instead argue that this court should apply a manifest weight standard in reviewing the trial court's findings.

Defendants cite three cases in support of their position, *Marx Transport, Inc. v. Air Express International Corp.*, 379 Ill. App. 3d 849 (2008), *Dean Management, Inc. v. TBS Construction, Inc.*, 339 Ill. App. 3d 263 (2003), and *Clean World Engineering, Ltd. v. MidAmerica Bank, FSB*, 341 Ill. App. 3d 992 (2003). Each of these cases is inapposite.

First, in *Marx Transport* the standard of review was not at issue. Both parties agreed that the court should adopt the manifest weight standard, and the court conducted no analysis as to whether that standard was correct. *Marx Transport*, 379 Ill. App. 3d at 854.

-4-

*Dean Management* and *Clean World Engineering* also fail to support defendants' claim. Nothing within the appellate court's opinion in either case indicates that the trial court relied exclusively on documentary evidence. Indeed, the appellate court in *Dean Management* referred to several witnesses' testimony at trial. *Dean Management*, 339 Ill. App. 3d at 268 ("Dostal corroborated Kehm's testimony at trial").

What *Dean Management* and *Clean World Engineering* do reflect is the general proposition that a reviewing court should not overturn a trial court's findings merely because it does not agree with the lower court. *Bazydlo v. Volant*, 164 Ill. 2d 207, 214-15 (1995). Instead, the reviewing court should overturn those findings only if they are against the manifest weight of the evidence. *Bazydlo*, 164 Ill. 2d at 214-15.

The appellate court in *Dean Management* cites *Bazydlo* for that very proposition. Defendant Shackleford also quotes *Bazydlo* in its reply brief. However, the defendants overlook, and indeed omit from the quotation, language articulating the rationale behind applying a manifest weight standard to the trial court's findings.

This court in *Bazydlo* stated that "[t]he trial judge, as the trier of fact, is in a position superior to a reviewing court to observe witnesses while testifying, to judge their credibility, and to determine the weight their testimony should receive." *Bayzdlo*, 164 Ill. 2d at 214-15. See also *Clean World Engineering*, 341 Ill. App. 3d at 997.

In this case, the trial court heard no live testimony. Both parties acknowledged at oral argument that all testimony was submitted by admitting discovery depositions into evidence. The trial court was not required to gauge the demeanor and credibility of witnesses. See *State Bank of Clinton v. Barnett*, 250 Ill. 312, 315 (1911). Instead, the trial court made factual findings based upon the exact record presented to both the appellate court and to this court. Without having heard live testimony, the trial court was in no superior position than any reviewing court to make findings, and so a more deferential standard of review is not warranted. Thus, although this court has not done so recently, we reiterate that where the evidence before a trial court consists of depositions, transcripts, or evidence otherwise documentary in nature, a reviewing court is not bound by the trial court's findings and may review the record *de novo*. *State Bank of*

*Clinton*, 250 Ill. at 315; *Delasky v. Village of Hinsdale*, 109 Ill. App. 3d 976, 980 (1982); *Wolverine Insurance Co. v. Jockish*, 83 Ill. App. 3d 411, 413-14 (1980). In the case at bar, this court will review the trial court's findings *de novo*, and to the extent that the appellate court reviewed the record *de novo*, we hold that the appellate did not err in doing so.

## II. Burden of Proof

The parties also dispute whether Addison or defendants bear the burden of proving whether this accident constitutes one or two occurrences.

This court has long established that the burden is on the insured to prove that its claim falls within the coverage of an insurance policy. *Waste Management, Inc. v. International Surplus Lines Insurance Co.*, 144 Ill. 2d 178, 204 (1991). Once the insured has demonstrated coverage, the burden then shifts to the insurer to prove that a limitation or exclusion applies. *Fidelity & Casualty Co. v. Sittig*, 181 Ill. 111, 113 (1899); *Stoneridge Development Co. v. Essex Insurance Co.*, 382 Ill. App. 3d 731, 749 (2008); *Village of Hoffman Estates v. Cincinnati Insurance Co.*, 283 Ill. App. 3d 1011, 1013-14 (1996).

Addison contends that it is the defendants who must prove the number of occurrences in order to establish coverage. Addison cites *Reedy Industries, Inc. v. Hartford Insurance Co.*, 306 Ill. App. 3d 989 (1999). In *Reedy*, a company filed a claim with its insurer, asserting that an employee had stolen a large number of canisters containing freon. The insurance company denied the claim. In subsequent litigation the appellate court held that Reedy had failed to prove the number of occurrences and failed to prove that each occurrence exceeded the per-occurrence deductible.

The issue in *Reedy*, however, was not whether there was more than one occurrence. Reedy did not argue that the entire loss was a single occurrence, and both sides appeared to recognize that the loss occurred at different times. Rather, the court indicated that Reedy was unable to put forward any evidence of the number of occurrences or the amount of each loss. This was critical to the case in determining whether Reedy was required to pay separate deductibles.

-6-

The instant case is distinguishable. Here, the defendants have provided the necessary facts to demonstrate that their claims fall within the coverage of the policy. Those facts are that the injuries suffered by Hodgins and Carr are the types of injuries covered by Parrish's insurance policy and occurred on the property insured by Addison. The defendants have also established the value of the loss. Addison acknowledges these facts in part by Addison's willingness to settle the defendants' claim up to the policy limits.

Only after the defendants demonstrated coverage under the policy did Addison bring this declaratory action in an effort to limit coverage under the policy. The defendants originally claimed damages in excess of the policy limits. They settled for damages equal to the policy limits, which they contend is $2 million. Now, Addison seeks to limit recovery by applying the stricter policy limit. Therefore, we hold that Addison bears the burden of proving that the deaths of Carr and Hodgins constitute one occurrence.

### III. Single or Multiple Occurrences

Lastly, we consider whether the trial court erred in concluding that the boys' deaths constitute two occurrences under the insurance policy.

The policy itself defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." However, as in *Nicor, Inc. v. Associated Electric & Gas Insurance Services Ltd.*, 223 Ill. 2d 407 (2006), the meaning of occurrence is not in dispute. See *Nicor*, 223 Ill. 2d at 417-18. Instead, because the policy itself does not indicate when an injury will be treated as a separate occurrence, we must construe the policy by applying the facts of this case.

As noted above, the construction of a provision of an insurance policy is a question of law, subject to *de novo* review. *Nicor*, 223 Ill. 2d at 416. A court's primary objective in construing an insurance contract is to ascertain and give effect to the intention of the parties as expressed in the agreement. *Nicor*, 223 Ill. 2d at 416. An insurance contract will be liberally construed in favor of the insured. *Lenkutis v. New York Life Insurance Co.*, 374 Ill. 136, 140 (1940); *United*

*Services Automobile Ass'n v. Dare*, 357 Ill. App. 3d 955, 963-64 (2005).

We begin with a brief discussion of *Nicor*, because the parties disagree over whether the appellate court's opinion below properly applied *Nicor* to the present facts. The definitions of occurrence in both the *Nicor* and Addison policies are similar, and the same question is presented, *i.e.*, whether there were one or more occurrences.

In *Nicor*, multiple individuals suffered injury from mercury contamination. Before 1961, Nicor installed mercury-filled gas meter regulators in its customers' homes. After 1961, Nicor began a program of replacing these regulators with new regulators that did not contain mercury. Normally, the process was safe. However, in several cases, while replacing the old regulators, the regulators were tipped or broken, resulting in mercury being spilled and contaminating that particular customer's home. Eventually, this court was asked to determine whether the separate injuries to Nicor's affected customers constituted a single or multiple occurrences under Nicor's insurance policy.

In considering the proper way to determine the number of occurrences under an insurance policy, this court in *Nicor* considered which of two competing theories properly represented the law of Illinois. Under the "cause theory," a court will determine the number of occurrences by referring to the cause or causes of the damage. *Nicor*, 223 Ill. 2d at 418. Under the "effect theory," the number of individual claims or injuries resulting from the accident will determine the number of occurrences. *Nicor*, 223 Ill. 2d at 418.

After noting that neither theory inevitably favors one party to an insurance contract over another, we recognized that the cause theory represents the law of Illinois. *Nicor*, 223 Ill. 2d at 419-20. In so doing, this court observed that Illinois law is in line with that of a majority of jurisdictions. *Nicor*, 223 Ill. 2d at 419.

Adopting the cause theory did not end our analysis, however. Instead, cases both in Illinois and other jurisdictions have required further refinement of the cause theory in its application to a variety of factual situations. See *Nicor*, 223 Ill. 2d at 420-31. Relying on this body of case law, this court considered whether the cause of the

victims' injuries was a systemwide failure to safely remove the old regulators or the negligent replacement of those regulators in individual cases.

Ultimately, this court concluded that "where each asserted loss is the result of a separate and intervening human act, whether negligent or intentional, or each act increased the insured's exposure to liability, Illinois law will deem each such loss to have arisen from a separate occurrence." *Nicor*, 223 Ill. 2d at 431-32. Citing that conclusion, Addison contends that in this case the cause of both boys' injuries was Donald Parrish's sole negligent act of failing to properly secure and control his property.

A significant distinction between *Nicor* and the instant case is that *Nicor* primarily discussed affirmative acts of negligence rather than an ongoing negligent omission. This court determined that the actions of each individual technician in replacing the old regulators constituted a separate occurrence under the terms of the insurance policy. We specifically rejected, as did the appellate court in that case, the counterargument that Nicor's negligent systemwide failure to remove the regulators safely constituted a single cause, and therefore a single occurrence.

Likewise, a negligent insured's affirmative acts were at issue in both *Mason v. Home Insurance Co. of Illinois*, 177 Ill. App. 3d 454 (1988), and *Illinois National Insurance Co. v. Szczepkowicz*, 185 Ill. App. 3d 1091 (1989), cases specifically cited by the parties in this case. In *Mason*, each individual act of serving tainted sandwiches constituted a separate occurrence. *Mason*, 177 Ill. App. 3d at 461. In *Szczepkowicz*, a driver committed two separate acts of negligence. He initially positioned his truck where it would be struck by an approaching vehicle a first time. Then, he negligently moved the truck to a position where it could still be, and was, struck a second time. *Szczepkowicz*, 185 Ill. App. 3d at 1093.

Other appellate court cases cited by this court in *Nicor* also addressed affirmative acts of negligence. In *Village of Camp Point v. Continental Casualty Co.*, 219 Ill. App. 3d 86 (1991), the negligent act was an attorney's malpractice in misinterpreting state law. In *Illinois Central R.R. Co. v. Accident & Casualty Co. of Winterthur*, 317 Ill. App. 3d 737 (2000), the negligent acts were multiple

discriminatory hiring decisions made by one of the railroad's employees.

The facts in the case at bar vary significantly from these cases. Here, as Addison suggests, Parrish's liability arose from his negligently failing to properly secure and control his property. Addison is correct that Parrish committed no intervening negligent act between the injuries of each boy.

However, in light of these facts, applying *Nicor* in the way Addison suggests leads to an unreasonable interpretation of Parrish's insurance policy. Focusing on the sole negligent omission of failing to secure the property would allow two injuries, days or even weeks apart, to be considered one occurrence. The defendants raised this concern in the trial court. If several injuries suffered over the course of several weeks could be bundled into a single occurrence, the likelihood that damages would exceed a per-occurrence limit is significant, as demonstrated by the damages in the instant case. Purchasers of insurance such as Parrish would be left unprotected by their insurance policy, and liable for any amount above the per-occurrence limit. In accepting a per-occurrence limit, Parrish could not have intended to expose himself to greater liability by allowing multiple injuries, sustained over an open-ended time period, to be subject to a single, per-occurrence limit.

As a result, in situations where a continuous negligent omission results in insurable injuries, some limiting principle must be applied. The appellate court in *Roman Catholic Diocese of Joliet, Inc. v. Lee*, 292 Ill. App. 3d 447 (1997), utilized one particular approach. In that case, a priest committed multiple acts of sexual molestation against a child. Because the diocese's liability was the result of its negligent failure to supervise the priest, the court held that the cause of the injury was not each separate act of molestation. *Roman Catholic Diocese of Joliet*, 292 Ill. App. 3d at 455.

However, although the court found only one negligent omission, it did not conclude there was only one occurrence. Instead, it concluded that negligent supervision of the priest, over the course of several policy periods, constituted one separate occurrence for each policy period. *Roman Catholic Diocese of Joliet*, 292 Ill. App. 3d at 455. The court's rationale was that the decision not to supervise the priest was an omission that was "revisited" at a later time. The

-10-

decision at that time to continue to leave the priest unsupervised triggered the separate occurrence in the subsequent policy period. *Roman Catholic Diocese of Joliet*, 292 Ill. App. 3d at 455.

Although analyzing whether a negligent omission was "revisited" was proper in *Roman Catholic Diocese of Joliet*, such an approach may not settle the question under different factual circumstances. In the instant case, it is clear that Parrish did not "revisit" his negligent omission, *i.e.*, his failure to properly secure his property, between the injuries suffered by Carr and Hodgins. The limiting principle articulated in *Roman Catholic Diocese of Joliet* therefore is not instructive here.

The appellate court in this case applied a different limitation. The court below analyzed the instant case using what has been called a "time and space" test. In describing this test, the appellate court relied primarily on a New Jersey appellate court case, *Doria v. Insurance Co. of North America*, 210 N.J. Super. 67, 509 A.2d 220 (1986).

The facts in *Doria* are strikingly similar to the facts in the instant case. Two brothers gained access to an unused swimming pool area. The pool had been emptied and negligently maintained. Water had accumulated within the pool and was covered with a thick layer of leaves. One brother was injured when he fell into it. The other brother immediately leaned into the pool, holding a stick for his brother to grab onto. In doing so, the second brother also fell into the pool and injured himself.

The New Jersey court applied a time and space test. Under that test, "if cause and result are simultaneous or so closely linked in time and space as to be considered by the average person as one event," then the injuries will be deemed the result of one occurrence. *Doria*, 210 N.J. Super. at 74, 509 A.2d at 224, citing C. Drechsler, Annotation, *What Constitutes "Each," "a Single," "One," "Any One," "Any," or "An" Accident or Occurrence, Within Liability Policy Limiting Insurer's Liability to Specified Amount*, 55 A.L.R.2d 1300 (1957). The court emphasized that the time and space analysis must be made on a case-by-case basis. *Doria*, 210 N.J. Super. at 75, 509 A.2d at 224.

The court held that there was but one occurrence. *Doria*, 210 N.J. Super. at 75, 209 A.2d at 224. In reaching its conclusion, the New

Jersey court recognized first that the injuries to both boys resulted from a single cause, the property owner's negligent maintenance of the pool area. *Doria*, 210 N.J. Super. at 75, 209 A.2d at 224. The court then indicated that the temporal and spatial connection between the injuries was sufficient to conclude that the average person would have considered it one event. *Doria*, 210 N.J. Super. at 75-76, 209 A.2d at 224-25.

In the instant case, we think the appellate court properly adopted a "time and space" test. The insured's negligence consisted of an omission, the failure to maintain the property. Where negligence is the result of an ongoing omission rather than separate affirmative acts, a time and space test effectively limits what would otherwise potentially be a limitless bundling of injuries into a single occurrence.

Nonetheless, although we conclude that the appellate court properly analyzed the facts under a time and space test, we cannot accept the court's opinion that the facts conclusively demonstrate that the injuries to Hodgins and Carr constitute only a single occurrence.

We review the factual findings of the trial court, in this case, *de novo*. The record presented both to the trial court and the appellate court reflects the fact that what can be known about the events of April 30, 1997, is far outstripped by what cannot be known. The record indicates that Justice Carr and Everett Hodgins left together from Laura Shackelford's home around 5 p.m., with the apparent intention to go fishing. The record further indicates that by May 3, 1997, both boys had become trapped in the wet sand on Donald Parrish's property and had succumbed to hypothermia, or drowning secondary to hypothermia.

From the evidence presented at trial, we can infer that the boys did not become trapped simultaneously. We can also infer that Hodgins became trapped after Carr, in an attempt to free Carr from the sand.

Beyond these basic facts and inferences, there is little evidence to support Addison's claim that the injuries suffered by these two boys were the result of a single occurrence. The police investigators could not determine how closely in time the boys became trapped. They suggested it could have been seconds or minutes apart, but acknowledged that there was no way to know. Nor could the medical

experts give a time of death with certainty, or indicate how closely in time the two boys had died. Any opinions on these issues of timing would be inappropriately speculative.

The substantial uncertainty on this issue persuades us that Addison cannot meet its burden of proving that the two boys' injuries were so closely linked in time and space as to be considered one event. Because Addison cannot meet its burden, we hold that the injuries to Carr and Hodgins constitute two occurrences. Therefore, defendants' claims are subject to the general aggregate limit rather than the lower per-occurrence limit.

Finally, we note that defendants would ask this court to go even further and interpret *Nicor* to hold that Everett Hodgins's attempt to rescue his friend constituted a separate and intervening act, which increased Parrish's liability. Our conclusion in *Nicor* did not expressly include the actions of the injured parties. In *Nicor*, this court was confronted with factual circumstances which solely involved actions of the negligent party, the insured.

The factual circumstances of this case lead us to decline to extend *Nicor* in the manner suggested by the defendants. Too much about the events during the time the boys were missing is, and will remain, unknown. The separateness and independence of Hodgins's acts is, as noted above, mere speculation. Although the speculativeness of what occurred the night of April 30, 1997, weighs in favor of defendants with respect to Addison's burden of proving a single occurrence, it also presents a dangerous factual foundation for extending *Nicor*'s rationale. Without knowing the precise sequence and timing of events, it would be unwise for this court to make a determination on this issue. Therefore, we do not address it.

## CONCLUSION

We therefore reverse the judgment of the appellate court and hold that the deaths of Hodgins and Carr constitute two occurrences under the terms of Addison's insurance policy. The judgment of the circuit court is therefore affirmed.

*Appellate court judgment reversed;*
*circuit court judgment affirmed.*

-13-

CHIEF JUSTICE FITZGERALD took no part in the consideration or decision of this case.